IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAINE LOBSTERMEN'S ASSOCIATION,
INC.
2 Storer St., Suite 203
Kennebunk, ME 04043

        Plaintiff,

v.

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, MD 20910

GINA RAIMONDO, in her official capacity
as Secretary of Commerce,
United States Department of Commerce
1401 Constitution Avenue, NW
Washington, D.C. 20230

JANET COIT,
in her official capacity as
Assistant Administrator for Fisheries,
National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

        Defendants.

Case No.: 1:21-cv-2509

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.  INTRODUCTION

1.     The Maine lobster fishery is essential to Maine's culture, heritage, and economy.

For more than 175 years, the fishery has supported communities and generations of families in

Maine, while ensuring that this important natural resource is sustainably harvested for

generations to come. This conscientious stewardship has been undeniably successful—the Maine

*Maine Lobstermen's Ass'n v. NMFS et al.*

lobster stock continues to thrive at healthy levels and the fishery remains one of the most valuable in the United States.

2. Despite being a model for sustainability success, the Maine lobster fishery itself is now endangered as a result of a misguided federal decision that is directly at odds with both the best available science and ecological knowledge gained from the experience of fishermen.

3. Specifically, in 2021, the National Marine Fisheries Service ("NMFS") issued a biological opinion (the "2021 BiOp"), pursuant to the Endangered Species Act ("ESA"), that evaluates the impacts of multiple fishery management plans (including for the Maine lobster fishery) on the North Atlantic right whale. Through a "Conservation Framework," the 2021 BiOp mandates that U.S. fixed gear fisheries (including the Maine lobster fishery) implement *more* conservation measures to achieve an *additional* 98% reduction in the incidence of "serious injury and mortality" interactions between this fishing gear and North Atlantic right whales over the next 10 years.

4. NMFS's mandate ignores the reality that the Maine lobster fishery *already* has an extremely low incidence of interactions with right whales due, in part, to a suite of mitigation measures that have been implemented for many years. Reducing its already low impact *by another 98%* is not possible without driving most of Maine's harvesters out of business permanently.

5. Should NMFS's draconian mandate be imposed, the Maine lobster fishery will not exist as we know it today and the opportunity for future generations to continue this proud heritage will be lost. Lives and livelihoods will be uprooted, and a cultural tradition that has existed for more than 175 years will be gone. To make matters worse, these tragic losses will be for naught. NMFS will have accomplished no meaningful benefit to the North Atlantic right

*Maine Lobstermen's Ass'n v. NMFS et al.*

whale because, as reflected in its 2021 BiOp and discussed below, NMFS failed to forthrightly address the most significant causes of harm to North Atlantic right whales or to apply the best available science.

6.     Even though it is now being unjustifiably targeted by NMFS, the Maine lobster fishery has long embraced, and continues to embrace, a strong desire to conserve and coexist with the North Atlantic right whale. Indeed, the fishery has implemented measures over the past two decades to reduce the risk it posed to North Atlantic right whales, including drastic reductions in vertical lines, gear modifications, and effort reductions. These actions have come at no small cost to lobstermen and were implemented with extremely high compliance by lobstermen. And they have undeniably been successful as there has not been a *single* known North Atlantic right whale entanglement with Maine lobster gear in *almost two decades*. Moreover, there has *never* been a known North Atlantic right whale serious injury or mortality interaction associated with Maine lobster gear.

7.     Critically important new scientific information about right whale migration patterns shows that the Maine lobster fishery will continue to pose very little risk to North Atlantic right whales. Numerous independent scientists have demonstrated that changes in the oceanic environment have pushed the migration path of right whales out of the Western Gulf of Maine and squarely into heavily used waters in Canada—where whales feed and are routinely entangled in snow crab fishing gear and struck by vessels, and where conservation measures have lagged far behind those implemented in the Maine lobster fishery. This new information establishes that North Atlantic right whales seldom migrate to, and even more rarely aggregate or feed in, Maine's commercial lobster fishing areas.

*Maine Lobstermen's Ass'n v. NMFS et al.*                                    3

8.      The 2021 BiOp is divorced from this reality. It is premised on the single erroneous assumption that all fishing rope presents equally deadly risk to North Atlantic right whales and, therefore, all rope must be eliminated regardless of what the best available information *actually* shows about the relative risks to right whales. When operating upon this false premise, the Maine lobster fishery becomes an easy regulatory target for NMFS because it is the largest U.S. fishery addressed by the 2021 BiOp and, as such, has the most rope in the water.

9.      Because the 2021 BiOp is based on the simplistic and false premise that more lobster rope in the water equals more risk to whales—regardless of gear type, location, configuration, presence of weak insertions, other mitigation measures, oceanographic conditions, and whale behavior and distribution—it exaggerates and arbitrarily inflates the risk posed by the Maine lobster fishery. Even worse, NMFS erroneously attributes impacts to the Maine lobster fishery that are, in fact, caused by other fisheries (such as the Canadian snow crab fishery) or by non-fishing vessels that are well-known to strike and kill North Atlantic right whales. NMFS relies on these demonstrably incorrect assumptions and attributions to justify its plan to squeeze the fishery down to reach an artificially derived risk reduction factor of 98%.

10.      Unfortunately, these punishing measures will provide no appreciable benefit for the North Atlantic right whale while at the same time decimating the Maine lobster fishery. Eliminating the Maine lobster fishery will not end right whale deaths in Canada or vessel strikes. The 2021 BiOp truly accomplishes a "lose-lose" situation for whales and the lobster fishery. This regrettable result is the quintessential example of unlawful agency decision-making that long ago caused the Supreme Court to admonish federal agencies to adhere to the ESA's "best available science" requirement in order to "avoid needless economic dislocation produced by agency

*Maine Lobstermen's Ass'n v. NMFS et al.*

officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).

11.     The Maine Lobstermen's Association, Inc. ("MLA") is dedicated to the preservation of a sustainable lobster resource, and to the fishermen and communities that depend on the Maine lobster fishery. MLA has proactively worked to develop, and consistently supported, conservation measures for the North Atlantic right whale based on sound science. But, as described above and in the allegations that follow, the 2021 BiOp is neither sound science nor lawful. The 2021 BiOp's failure to identify, present, and apply the best available science to its assessment of the North Atlantic right whale unfairly and arbitrarily places useless conservation burdens on the Maine lobster fishery.

12.     MLA brings this lawsuit because NMFS's imposition of draconian measures on the Maine lobster fishery will not halt the decline of the North Atlantic right whale while simultaneously resulting in a devastating economic hardship on the more than 4,800 individually owned and operated lobster fishing vessels and the tens of thousands of jobs they support, all of which are essential to Maine's economy and irreplaceable aspects of the State's coastal and maritime heritage.

13.     Defendants' approval of the 2021 BiOp is unlawful because NMFS did not rely on the best available scientific information, made erroneous and arbitrary assumptions unsupported and contradicted by data and evidence, relied on an outdated and flawed methodology to model projections of the North Atlantic right whale population, and inexplicably failed to account for either the positive impact of mitigation measures already or soon-to-be employed by the Maine lobster fishery. NMFS also ignored or arbitrarily discounted evidence submitted by MLA and others that would have enabled the agency to correct its mistakes.

*Maine Lobstermen's Ass'n v. NMFS et al.*

14. The 2021 BiOp is already impacting the Maine lobster fishery. On September 17, 2021, NMFS issued a final rule amending the regulations implementing the Atlantic Large Whale Take Reduction Plan (the "TRP Rule"), which included, *inter alia*, a fishing closure (termed the "LMA 1 Seasonal Restricted Area") applicable to participants in the Maine lobster fishery. 86 Fed. Reg. 51,970 (Sept. 17, 2021). This closure applies to a large area of productive fishing grounds where right whale sightings have not been documented. NMFS relied on the 2021 BiOp to comply with ESA Section 7 when it issued the TRP Rule.

15. MLA seeks an order from the Court declaring that NMFS's 2021 BiOp and the TRP Rule are arbitrary, capricious and in violation of the ESA, 16 U.S.C. §§ 1361–1389, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and remanding the 2021 BiOp and TRP Rule to NMFS without vacatur to address these flaws.

## II.  JURISDICTION AND VENUE

16. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question arising under the laws of the United States) and under 28 U.S.C. § 1346 (actions against the United States).

17. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because this action is brought against an agency of the United States and officers of the United States acting in their official capacities and because Defendants maintain offices in the District of Columbia.

## III.  PARTIES

### A.  Plaintiff

18. Plaintiff MLA is a private, not-for-profit trade association representing more than 1,200 lobster harvesters who fish in the waters off the Maine coast. Founded in 1954, MLA is the oldest and largest fishing industry association on the east coast. MLA and its members are committed to the preservation of a sustainable lobster resource and the fishermen and

*Maine Lobstermen's Ass'n v. NMFS et al.*

communities that depend on it. MLA has provided a credible voice for the Maine lobster industry on marine resource management issues and is highly regarded by stakeholders in the health of Maine's unique coastal and marine resources.

19.     MLA brings this lawsuit on behalf of its members, who fish in waters subject to NMFS's 2021 BiOp that is the subject of this Complaint.

20.     MLA has been actively and diligently involved in efforts to protect the North Atlantic right whale population. For decades, MLA has been working in earnest with NMFS, the Maine Department of Marine Resources, representatives of the environmental and scientific communities, and other stakeholders. MLA has been an industry leader in the development and implementation of practical management measures and harvesting practices that effectively minimize risk to right whales when they are present in waters fished by Maine lobstermen.

21.     MLA members fish in waters subject to NMFS's 2021 BiOp issued under the ESA as well as NMFS's Atlantic Large Whale Take Reduction Plan ("TRP" or "Take Reduction Plan") issued under the Marine Mammal Protection Act ("MMPA"). MLA's members engage in fishing practices authorized under the TRP, including the TRP Rule, and the 2021 BiOp. MLA members also fish in Maine's coastal waters that are exempted from the TRP due to the extremely low probability of North Atlantic right whale impacts in those areas (but where precautionary right whale conservation measures are nevertheless employed).

22.     MLA and its members have collaborated with scientists in developing and testing fishing gear to reduce the risk of entanglement over many decades. Beginning in the 1990s, MLA partnered with NMFS's gear team to measure gear profiles, test "weak links" below the buoy, and explore other gear modifications. MLA also worked with researchers in the 2000s to establish methods and standards to deploy weak links, develop buoy line marking methods,

*Maine Lobstermen's Ass'n v. NMFS et al.*

deploy remotely operated vehicles and sensors to measure groundline rope profiles, and test a variety of vertical line modifications such as weak rope, stiff rope, glow rope and time tension line cutters. Since 2010, MLA and its members have worked with scientists to publish a resource describing lobster gear and configurations deployed in the New England lobster fishery, map lobster fishing effort in Maine, develop a fishing gear/right whale risk model, document wear issues associated with sinking groundlines and methods to improve wear of those lines, identify options for best fishing practices, test colored vertical lines as a deterrent, measure the breaking strength of existing vertical lines, develop and test methods to weaken rope, develop time tension line cutters, and trial ropeless fishing.

23.     Over the past decade, the Maine lobster fishery has substantially reduced the risk it once presented to North Atlantic right whales through implementation of risk reduction measures.  The best available data show that those measures have been effective at reducing interactions with North Atlantic right whales.

24.     MLA's members are on the front line of right whale protection efforts in the Gulf of Maine because they are responsible for implementation of harvesting practices designed to reduce potentially harmful interactions between right whales and lobster fishing gear. Maine's lobster harvesters have made multiple changes in the deployment of fishing gear that have demonstrably reduced the risk of harm to right whales in the Gulf of Maine. As stewards of the marine environment, Maine lobstermen's compliance with these measures is very high.

25.     MLA and its members derive economic, professional, aesthetic, and cultural benefits from the Maine lobster fishery. Defendants' promulgation of the 2021 BiOp and TRP Rule based on faulty science and assumptions in violation of the ESA and APA has caused and continues to cause economic, aesthetic, cultural and procedural injury to MLA and its members'

interests in the Maine lobster fishery through the imposition of arbitrary risk reduction targets and mandating superfluous current and future obligations to reduce North Atlantic right whale fishing gear interactions. MLA and MLA's members' injuries will be redressed by the relief they request, as that relief would undo the causes of those actual and threatened injuries. MLA and its members have no other adequate remedy at law.

**B.    Defendants**

26.    Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce and is sued in her official capacity. Secretary Raimondo directs all business of the Department of Commerce and is the official ultimately responsible under federal law for ensuring that the actions and decisions of the Department comply with all applicable laws and regulations.

27.    Defendant Janet Coit is Deputy Administrator of the National Oceanic and Atmospheric Administration ("NOAA") and Assistant Administrator for NMFS. Administrator Coit has responsibility for implementing and fulfilling the agency's duties under the ESA. Administrator Coit is sued in her official capacity.

28.    Defendant NMFS is an agency within the U.S. Department of Commerce and is sometimes referred to as NOAA Fisheries. NMFS is the agency to which the Secretary of Commerce has delegated authority to manage productive and sustainable fisheries and to conserve protected resources.

## IV.  LEGAL FRAMEWORK

**A.    Endangered Species Act**

29.    The ESA protects imperiled species by providing the implementing agencies with authority to list qualifying species as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §

*Maine Lobstermen's Ass'n v. NMFS et al.*

1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

30.     Additionally, Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" listed species or result in the "destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). NMFS does so by issuing a biological opinion. 50 C.F.R. § 402.14(g)(4).

31.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NMFS when their actions "may affect" a listed marine species. 16 U.S.C. § 1536(a)(2). The agencies must utilize the "best scientific and commercial data available" during the consultation process. *Id.*; 50 C.F.R. § 402.14(f), (g)(8). If NMFS determines that the agency action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action. 16 U.S.C. § 1536(b)(3). The agencies may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13.

32.     A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in "take" incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4). Among other requirements, an incidental take statement must specify any "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize the impact of any incidental take as well as "terms and conditions" to implement those measures. *Id.*; 50 C.F.R. § 402.14(i).

**B.      Marine Mammal Protection Act**

33.      The MMPA, like the ESA, generally prohibits the "taking" of marine mammals.

16 U.S.C. § 1371(a). Commercial fishing operations, however, may incidentally take marine

mammals provided that they comply with the requirements of the MMPA. 16 U.S.C. § 1387.

34.      The MMPA's protective standards are qualitatively more stringent than the ESA's

standards and more protective of marine mammals. One of the MMPA's most precautionary

conservation metrics is the "potential biological removal level." 16 U.S.C. § 1362(20). The

potential biological removal level is the "maximum number of animals, not including natural

mortalities, that may be removed from a marine mammal stock while allowing that stock to reach

or maintain its optimum sustainable population." *Id*. "Optimum sustainable population," in turn,

means "with respect to any population stock, the number of animals which will result in the

maximum productivity of the population or the species, keeping in mind the carrying capacity of

the habitat and the health of the ecosystem of which they form a constituent element." *Id*. §

1362(9).

35.      The MMPA imposes additional conservation measures for "strategic stocks."

Strategic stocks include those marine mammals that are listed as threatened or endangered under

the ESA, as well as those stocks where the human-caused mortality exceeds the potential

biological removal level. *Id*. § 1362(19). The MMPA authorizes, and, in some cases, requires

NMFS to "develop and implement a take reduction plan designed to assist in the recovery or

prevent the depletion" of strategic stocks that interact with commercial fisheries. *Id*. § 1387(f)(1).

The take reduction plan is developed by the take reduction team, which is established by NMFS

pursuant to the requirements of the MMPA. *Id*.

**C.      Administrative Procedure Act**

36.      The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

*Maine Lobstermen's Ass'n v. NMFS et al.*

37.     Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

38.     Suits against the government for maladministration of the ESA are properly brought under the APA. *See Conservation Force v. Salazar*, 753 F. Supp. 2d 29 (D.D.C. 2010).

39.     An agency's issuance of a biological opinion constitutes "final agency action" subject to review under the APA. *See Bennett*, 520 U.S. at 178.

## V.  BACKGROUND

### A.     History of the Maine Lobster Fishery

40.     The Maine lobster fishery is one of the oldest continuously operated industries in the United States. With the advent of canning, Maine established the first commercial lobster fishery in the 1840s. In the intervening 180 years, the tradition of lobstering has been passed down for generations and is a cornerstone of Maine's culture, heritage, and economy.

41.     The Maine lobster fishery has long prided itself on being a sustainable industry. The fishery adopted rules in the late 1800s to protect the resource and prevent overfishing by restricting the fishery to trap gear, banning the catch of and protecting egg-bearing female lobsters, and restricting the size of lobsters that may be retained. Through these and other conservation measures, the lobster fishery remains vibrant today and is one of the country's most valuable commercial fisheries. In 2020 alone, over $405 million worth of lobster was caught off the coast of Maine. For rural coastal communities in Maine, the lobster fishery is the economic engine that keeps those towns alive.

42.     The Maine lobster fishery supports tens of thousands of jobs and hundreds of ancillary businesses. Maine's lobster fleet directly supports more than 10,000 jobs—including

*Maine Lobstermen's Ass'n v. NMFS et al.*

3,670 captains, up to 5,750 crew, and 1,095 students. Maine's wholesale lobster distribution supply chain is estimated to contribute an additional $967 million and 5,500 jobs.

**B.      The North Atlantic Right Whale**

43.      In the early 1890s, commercial whalers hunted North Atlantic right whales to the brink of extinction. As a result, the North Atlantic right whale has been listed as endangered under the ESA or its predecessor act since 1970. The Maine lobster industry recognizes the need for conservation of the North Atlantic right whale, and Maine lobstermen have taken proactive steps to ensure that the lobster fishery and North Atlantic right whales can coexist.

44.      Since the inception of the Atlantic Large Whale Take Reduction Team ("Take Reduction Team") in the mid-1990s, MLA has been a leader in federal and state efforts to preserve and protect the health of the North Atlantic right whale population when the animals transit the waters off the Maine coast. MLA has been a key player in the development and implementation of practical management measures and lobster harvesting practices to minimize risk to North Atlantic right whales.

45.      MLA's members are on the front lines of right whale protection efforts in the Gulf of Maine because they are responsible for implementing harvesting practices designed to reduce potentially harmful interactions between right whales and lobster fishing gear. Maine's lobster harvesters have made many changes in the deployment of harvesting gear, including removing all floating line from the surface, incorporating "weak links" into buoy lines, deploying sinking groundlines in non-exempt waters, and significantly reducing the amount of vertical lines in the water column by adding more traps per end-line. These measures have combined to demonstrably reduce the risk of harm to right whales from the lobster fishery in the Gulf of Maine. Maine lobstermen also mark their buoys and end-lines to aid in identifying the origin of fishing gear if it were to entangle a whale despite these mitigation efforts. The State of Maine

*Maine Lobstermen's Ass'n v. NMFS et al.*

implemented new lobster gear marking regulations in 2020 that expand and enhance gear marking requirements beyond what has been required under the TRP.

46.     There has never been a known North Atlantic right whale serious injury or mortality associated with Maine lobster gear.

**C.     Previous Litigation Challenging the 2014 Biological Opinion**

47.     On January 18, 2018, a coalition of environmental advocacy groups filed a lawsuit challenging the biological opinion issued by NMFS in 2014 (the "2014 BiOp") regarding effects of the American Lobster Fishery on the North Atlantic right whale. Those groups alleged that the 2014 BiOp violated the ESA, the MMPA, and the APA.

48.     Shortly after the lawsuit challenging the 2014 BiOp was filed, MLA intervened in the litigation to protect the interests of its members.

49.     On April 9, 2020, the District Court for the District of Columbia issued a decision invalidating NMFS's 2014 BiOp. *Ctr. for Biological Diversity v. Ross*, No. CV 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020). Although the Court vacated a portion of the 2014 BiOp pertaining to the North Atlantic right whale, the Court stayed its order for nine months until May 31, 2021, thereby allowing the lobster fishery to continue operating and providing NMFS additional time to complete work on a new biological opinion and a new MMPA rule. *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. Aug. 19, 2020).

**D.     The 2021 Biological Opinion**

50.     NMFS initiated the Section 7 consultation leading to the draft biological opinion ("Draft BiOp") against the backdrop of an unusual mortality event declared in mid-2017—which included the unprecedented loss of 12 right whales in Canada—interrupting a prolonged period of improvement in the prospects for recovery of the North Atlantic right whale. The right whale population had nearly doubled under the guidance of the Take Reduction Team and the

*Maine Lobstermen's Ass'n v. NMFS et al.*

14

associated TRP implemented by NMFS pursuant to Section 118(f) of the MMPA, reflecting two decades of collaboration among lobstermen, researchers, managers, and other stakeholders to develop and implement innovative fishing practices and gear strategies to reduce interactions between whales and fishing gear.

51.     On October 1, 2019, MLA requested that NMFS grant MLA "applicant status," pursuant to ESA Section 7, for the consultation that led to the issuance of the 2021 BiOp. On October 24, 2019, NMFS denied MLA's request for applicant status.

52.     NMFS released the Draft BiOp on January 15, 2021. MLA, along with 11 other lobster fishing associations and stakeholders representing active participants in the American Lobster Fishery as well as the individuals and organizations that rely upon the fishery, submitted detailed comments, identifying significant concerns associated with the data and analyses presented in the Draft BiOp. MLA's comments also made recommendations for additional data and analyses to be considered and undertaken by NMFS to ensure that the decision complies with the ESA. *See* Exhibit A.

53.     On May 27, 2021, NMFS released the final 2021 BiOp. The deficiencies and concerns identified by MLA and other commenters on the draft 2021 BiOp were not addressed by NMFS in the final 2021 BiOp. These deficiencies include, but are not limited to, the following.

    **1.     NMFS arbitrarily assigned right whale impacts from Canadian fisheries to the Maine lobster fishery.**

54.     In the 2021 BiOp, for the purpose of apportioning "risk" levels, NMFS determined that all fishing gear entanglements with North Atlantic right whales of "unknown" origin should be equally allocated (50:50) between the U.S. and Canada. This determination is one of the most significant unsupported assumptions in the 2021 BiOp because the vast majority

*Maine Lobstermen's Ass'n v. NMFS et al.*

of all right whale serious injury and mortality entanglements attributed to the American Lobster

Fishery are either cases with no fishing gear at all or involve fishing gear of unknown origin,

most of which does not have the characteristics of Maine lobster gear. Moreover, in recent years,

most right whale serious injury and mortality entanglements involving fishing gear of known

origin involve Canadian fishing gear. NMFS's apportionment of risk levels is arbitrary and

contrary to the best available scientific and commercial information for these and the following

reasons as well as other reasons brought to NMFS's attention in comments on the draft 2021

BiOp.

55.     The best available data show an increasing trend in known right whale

entanglements, particularly in the proportion of entanglements causing serious injury and

mortality, with Canadian fishing gear. At the same time, known entanglements in U.S. fisheries,

particularly the Maine lobster fishery, have decreased, with none being observed in the Maine

lobster fishery in over 17 years. The 2021 BiOp erroneously discounts the value of known

entanglement trends despite NMFS's own data showing that many of all known whale

entanglements have been confirmed to a specific country of origin from 2016 to 2019. The 2021

BiOp's treatment of the data for known fishery interactions is arbitrary and unsupported.

56.     NMFS incorrectly relied on a general assumption that right whales spend more

time in U.S. waters than in Canadian waters and that right whales would be equally at risk of

entanglement in either country. There are no data to support this assumption. In so doing, NMFS

arbitrarily discounted or ignored the fact that the best available science demonstrates that North

Atlantic right whales have shifted their migratory routes away from Maine lobster fishing

grounds and into Canadian fishing grounds that right whales reach without transiting the Maine

lobster fishery. NMFS also arbitrarily failed to consider the risk to right whales during

*Maine Lobstermen's Ass'n v. NMFS et al.*

occupancy of *fishing grounds* and, instead, considered assumed risk to the animals in all waters (regardless of whether fishing occurs in those waters). For example, right whale residency time in more southern locations in the U.S. is not indicative of the entanglement risk of the Maine lobster fishery, which is located well to the north of U.S. coastal areas where North Atlantic right whales are known to feed or calve.

57.     Canada had few, if any, risk reduction measures in place prior to 2017, whereas U.S. fisheries implemented measures dating back to 1999, including conservation enhancements in 2009 and 2014 that significantly reduced the amount of rope in the Gulf of Maine. And although the 2021 BiOp acknowledges that the rapidly expanding Canadian snow crab fishery uses heavier and more lethal gear, it fails to attribute a higher risk to this gear. The 2021 BiOp fails to properly account for these relevant factors. Moreover, recent analyses indicate that Canadian mitigation measures have been less effective than U.S. measures that were first implemented in 2009. Thus, NMFS overestimated the risk posed by the Maine lobster fishery while underestimating the risk from Canadian fisheries.

58.     The 2021 BiOp also fails to address the difference in observation effort between Canadian and U.S. waters. Survey effort in U.S. waters has historically been significantly greater than in Canadian waters. As a result, entanglement events in Canadian waters were likely under-sampled prior to 2017, the year when survey effort in Canada was increased with the assistance of NMFS.

59.     Formal peer reviewers of modeling conducted in support of the 2021 BiOp and federal scientists have acknowledged the lack of scientific basis for NMFS's arbitrary 50:50 allocation of unknown-origin entanglements between Canada and the U.S., emphasizing that the established shift in right whale migratory routes into previously unregulated areas has resulted in

an increase in entanglements, including serious injury and mortality, in Canadian trap/pot gear. Experts and scientists have concluded that the largest current entanglement threat to North Atlantic right whales is posed by Canadian snow crab fishing gear. Indeed, the Atlantic Scientific Review Group recently recommended that NMFS reassess its 50:50 apportionment of right whale mortality between the U.S. and Canada. The 2021 BiOp directly conflicts with these scientific determinations and recommendations.

60.     The 2021 BiOp erroneously and arbitrarily places undue emphasis on the quantity of vertical lines in the water when assigning risk to fisheries, and arbitrarily discounts (a) trends within and among gear types associated with right whale entanglements, (b) right whale geographic and temporal occurrence, (c) right whale behavior, (d) the location and timing of different fisheries and gears fished, and (e) relative threats from different gear types based on target fisheries, gear densities and configurations.

61.     The result of NMFS's arbitrary and unsupported determination to apportion right whale entanglements with fishing gear of unknown origin equally between the U.S. and Canada is that the 2021 BiOp assigns risk (and therefore impact) to the Maine lobster fishery that, in fact, derives from Canadian fisheries. The 2021 BiOp is therefore premised on an assumption that the Maine lobster fishery causes more impact to the North Atlantic right whale than is otherwise demonstrated by the best available scientific and commercial information.

**2.      NMFS arbitrarily attributed all impacts from right whale entanglements with unknown fishing gear in the U.S. to the lobster fishery.**

62.     NMFS arbitrarily allocated the U.S. portion of all North Atlantic right whale entanglements of unknown origin to the American Lobster Fishery, contrary to the best available information, which indisputably shows that right whales are entangled with U.S. fishing gear other than lobster gear.

63.     The 2021 BiOp arbitrarily ignores data showing that, after accounting for
confirmed entanglements in Canadian snow crab gear, entanglement observations involving
confirmed gear types suggest that right whales are nearly twice as likely to be entangled in
fishing gear other than lobster gear. The 2021 BiOp arbitrarily ignores or discounts data showing
that, in addition to entanglement risk, the potential of a severe entanglement is greater for non-
lobster gear. It also arbitrarily ignores data in entanglement cases where the fishery that is the
source of the entanglement cannot be determined but the Maine lobster fishery can be ruled out
as the source.

64.     The 2021 BiOp arbitrarily fails to address the potential for a right whale to shed
lobster versus non-lobster gear, which is highly relevant considering that scarring data indicate
that whales break free of fishing gear on their own in the majority of incidents, and two-thirds of
all entanglement events are minor and do not result in serious injury to the individual whale.
NMFS's data on documented entanglements also show that nearly half of all whale entanglement
cases that cannot be traced to a fishery have no gear present.

65.     The 2021 BiOp erroneously and arbitrarily places undue emphasis on the quantity
of gear in the water when assigning risk among U.S. fisheries and arbitrarily fails to analyze
differences between lobster and non-lobster fisheries with respect to the potential to cause
mortality and serious injury due to the nature of the gear or to whale behavioral patterns.

66.     The result of NMFS's arbitrary and unsupported determination to allocate all risk
from U.S. entanglements of undetermined origin to the American Lobster Fishery—despite
indisputable evidence to the contrary—is that the 2021 BiOp assigns risk (and therefore impact)
to the Maine lobster fishery that, in fact, derives from other fisheries. The 2021 BiOp is therefore
premised on an assumption that the Maine lobster fishery causes more impact to the North

Atlantic right whale than is otherwise demonstrated by the best available scientific and commercial information.

### 3. The 2021 BiOp's Conservation Framework is fundamentally flawed.

67. The 2021 BiOp relies on a Conservation Framework that is fundamentally flawed. The Conservation Framework includes four phases over 10 years and expects and requires the Maine lobster fishery to ultimately achieve a 98% reduction in North Atlantic right whale mortality and serious injury at the end of phase four. The Conservation Framework (a) inflates the amount of take attributable to the Maine lobster fishery with overly conservative or erroneous assumptions, (b) fails to fully account for and incorporate the benefits from risk reduction measures from early phases of the Conservation Framework, and (c) requires the Maine lobster fishery to implement a series of further, drastic, and likely ruinous measures.

68. Particularly unlawful is the Conservation Framework's 10-year benchmark of 0.136 average annual mortalities or serious injuries. This figure is arbitrary and unsupported by science or the law. NMFS provides no explanation supporting this metric or showing how it was calculated. NMFS's requirement that the mortality and serious injury rate "needs to be reduced" to 0.136 to achieve a "no jeopardy" determination has no precedent in the law, science, or practice, and arbitrarily demands a result that exceeds the requirements of both the ESA and the MMPA.

69. Even if it were possible to reduce the jeopardy inquiry to a single metric, there is no rational basis for NMFS to conclude that a mortality and serious injury rate of approximately *one-eighth* of the established "potential biological removal" rate established under the MMPA is *necessary* for a no-jeopardy finding.

70. Regulating the Maine lobster fishery down to an annual mortality and serious injury rate of 0.136 from the over-inflated impact rates attributed to the fishery under the 2021

*Maine Lobstermen's Ass'n v. NMFS et al.*

BiOp would mean the economic decimation, if not elimination, of the fishery. Moreover, NMFS's imposition of this metric is inconsistent with and undermines the MMPA's long-term take reduction planning goal, which expressly requires that take reduction plans consider impacts on fishery economics. The establishment of an imposed metric that exceeds requirements to meet MMPA goals and likely renders a fishery economically non-viable far exceeds NMFS's obligations and authority, and is arbitrary, *ultra vires*, and otherwise contrary to law. The 2021 BiOp, including its Conservation Framework, is therefore unlawful.

4. **NMFS failed to account for known causes of North Atlantic right whale mortality and arbitrarily assigned all cryptic mortality to anthropogenic causes.**

71. Without explanation, NMFS arbitrarily assumed there is no natural mortality among North Atlantic right whales. This assumption ignores published scientific literature that documents two natural sources of right whale mortality—predation by a growing white shark population on right whale calves and recent unfavorable oceanographic conditions resulting from climate change.

72. NMFS's disregard of natural sources of mortality has the effect of underestimating the reproductive capacity of the North Atlantic right whale species and ability of the population to rebound in response to a reduction in anthropogenic mortality and more favorable oceanographic conditions as this population has demonstrated in the past.

73. The effect of NMFS's arbitrary decision to ignore natural sources of mortality is magnified by NMFS's related arbitrary decision to attribute *all* cryptic mortality to anthropogenic sources. This, in turn, caused NMFS to erroneously overestimate the impact of the Maine lobster fishery on the North Atlantic right whale.

**5.      NMFS erroneously assigned a risk of entanglement to the Maine lobster fishery based on whale occurrence in areas where no lobster gear is present.**

74.      NMFS arbitrarily assumed that North Atlantic right whales are at risk of entanglement from lobster gear at any time when they are in U.S. waters, even when they are documented in large numbers in U.S. waters distant from the Maine lobster fishery and even in Maine waters where survey effort revealed rare presence of whales. This also caused NMFS to erroneously overestimate the impact of the Maine lobster fishery on the North Atlantic right whale.

**6.      NMFS failed to properly account for mitigation measures implemented by the American Lobster Fishery, including the Maine lobster fishery.**

75.      NMFS failed to properly account for the mitigation measures that the American Lobster Fishery, including the Maine lobster fishery, has implemented over more than two decades.

76.      Since 2009, an enhanced regulatory environment has resulted in significantly reduced risk of right whale entanglement in U.S. lobster fishing gear. Regulations developed and imposed at the state and federal level, including those implemented under the TRP, have significantly reduced both the amount of lobster fishing gear in the water and the risk of a severe outcome if a right whale encounters such gear.

77.      The regulated waters of the American Lobster Fishery converted to "sinking groundline" under the TRP in 2009. This requirement precludes the use of rope that floats between lobster traps, which eliminates the potential for whale entanglement in floating lines near the ocean bottom. This requirement removed over 27,000 miles of rope from New England waters.

78.      The American Lobster Fishery also implemented a "vertical line reduction" under the TRP in 2014, which established minimum traps per buoy line based on geographic area and

*Maine Lobstermen's Ass'n v. NMFS et al.*

distance from shore, resulting in the removal of approximately 2,740 miles of rope from New England waters.

79.     In 2015, the TRP regulations established a more than 3,000-square mile "Massachusetts Restricted Area," spanning Cape Cod Bay, Massachusetts Bay, and outer Cape Cod, which has been closed to lobster gear from February 1 to April 30 annually to reduce interactions between right whales and lobster gear.

80.     Additionally, a suite of universal gear requirements and modifications has been in place for more than 20 years to reduce entanglement risk to right whales. These requirements prohibit the use of floating line at the surface, require gear to be hauled at least every 30 days, and require the incorporation of weak links in the top of the buoy line and any attachments along the buoy line. Federally regulated fixed-gear fishermen are required to mark vertical lines to aid in identifying the source of gear involved in an entanglement. In 2020, Maine implemented new regulations to require unique and expanded gear markings.

81.     The American Lobster Fishery has reduced fishing effort across all jurisdictions since the inception of the TRP. For example, Area 3 under the TRP has implemented mandatory annual trap allocation limits of 5% per year, Massachusetts has a long-standing moratorium on lobster licenses, and Maine established a limited-entry program, all of which has resulted in a significant reduction in the risk of entanglement to North Atlantic right whales.

82.     The best available scientific and commercial data demonstrate that implementation of protective and mitigative measures by U.S. lobster fishermen has significantly reduced impacts and risk to North Atlantic right whales from lobster gear. Although the 2021 BiOp acknowledges that "risk reduction measures implemented in U.S. fisheries over the past

two decades have reduced impacts to [North Atlantic right whales] from U.S. fisheries," NMFS

arbitrarily failed to account for the benefits of such measures in the environmental baseline.

> **7.** **The 2021 BiOp does not properly account for the benefits of weak links in fishing lines.**

83.     NMFS failed to account for the full benefits associated with the use of "weak

links" or "weak points" in fishing lines to be required under the TRP Rule. In addition to

allowing a whale to break free of the gear, this mitigation measure will reduce the severity of any

entanglements that occur, decreasing the risk of right whale serious injury and mortality,

reducing stress on the animal, and enhancing the future health of the population. Published

scientific literature, ignored by NMFS's analysis, finds that the use of weak links and points in

fishing ropes can substantially reduce impacts to North Atlantic right whales.

84.     The American Lobster Fishery, including the Maine lobster fishery, implements

weak links below the buoy and will include weak points in vertical rope under the TRP Rule.

The 2021 BiOp arbitrarily discounts and fails to properly account for the benefits of doing so.

> **8.** **The 2021 BiOp relies upon flawed and inaccurate population modeling.**

85.     The 2021 BiOp relies on an outdated modeling methodology that cannot reliably

predict the North Atlantic right whale population in 50 years.

86.     The Linden (2021) study relied on by NMFS in making population projections

has numerous flaws that seriously undermine the 2021 BiOp's reliance on this model.

87.     The Linden (2021) model is overly sensitive to new data, improperly

parameterizes calving rates, improperly assumes an equal sex ratio, improperly assumes constant

and unfavorable environmental conditions will persist for 50 years, and improperly finds that

adult survival has the greatest potential effect on growth rate. As another example, Linden (2021)

entirely fails to incorporate or otherwise properly address improvements to the right whale

population by reducing mortalities to non-serious injuries. The consequence of these and many other errors brought to NMFS's attention is that the model relied upon by NMFS *underestimates* North Atlantic right whale stock size under all three scenarios evaluated and *overestimates* the likelihood of a declining population.

88.     NMFS's erroneous reliance on the flawed Linden (2021) model is exacerbated by the lack of quantitative assessment of model performance, and the "retrospective validation" of the modeling performed by NMFS is similarly unreliable.

**9.     NMFS arbitrarily relied upon a worst-case scenario.**

89.     NMFS admittedly relies on worst-case scenario assumptions by using, *inter alia*: a limited and non-representative time period of 2010–2019, which includes a spatial shift in the right whale forage base and the time when the species was struggling to adapt to this change; the all-time low reproductive rate (while arbitrarily excluding the all-time high calving rate by just one year); and a period of unusually high vessel strikes and a spike in entanglement in Canadian snow crab gear. NMFS then presumes those conditions will continue to be representative into the future.

90.     Furthermore, NMFS arbitrarily selected data from the 2010–2019 time period and assumed that unfavorable trends in oceanographic conditions would continue but did not take a similar approach with trends in observed data on the sources of entanglements. These latter trends demonstrate a precipitous decline in known U.S. entanglements, that disproportionately more entanglements are due to Canadian fisheries and, in the U.S., that more entanglements result from non-lobster gear. NMFS's selective and inconsistent use of this data is arbitrary.

**10.     The 2021 BiOp relies on other inaccurate modeling techniques.**

91.     In addition to NMFS's reliance on flawed and inaccurate population modeling, the 2021 BiOp relies on modeling techniques that do not accurately capture the risk within and

*Maine Lobstermen's Ass'n v. NMFS et al.*

among gear types and rigging methods or changes in risk due to changes in North Atlantic right whale behavior. This flawed modeling also caused NMFS to arbitrarily allocate assumed risk and impacts to the Maine lobster fishery contrary to the best available information.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM: The 2021 BiOp Arbitrarily, Capriciously, and Unlawfully Overestimates Impact and Risk from the American Lobster Fishery

92.     Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 91.

93.     Section 7 of the ESA requires NMFS to issue a biological opinion that evaluates the effects of an action based on an objective assessment of the "reasonably certain" effects of that action on threatened or endangered species and related critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.17 (effects of action must be "reasonably certain to occur"). A biological opinion must also properly account for the environmental baseline, which "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02 (definition for "environmental baseline").

94.     In evaluating the effects of the action, NMFS must use the "best scientific and commercial data" when developing a biological opinion. 16 U.S.C. § 1536(a)(2). The "obvious purpose" of this requirement "is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise," particularly when doing so would cause "needless economic dislocation." *Bennett*, 520 U.S. at 176.

95.     As set forth above and in MLA's comments on the Draft BiOp, NMFS, when assessing and determining the effects of the American Lobster Fishery on the North Atlantic right whale, failed to use the best available scientific or commercial information. NMFS further inflated the alleged negative effects of the American Lobster Fishery, including the Maine lobster fishery, by repeatedly including overly conservative and worst-case assumptions regarding the fishery's potential effects, contrary to the recommendations of independent experts. These errors include, but are not limited to, the 2021 BiOp's (1) allocation of U.S./Canadian entanglements on a 50/50 basis, (2) attribution of U.S. entanglements with unknown fishing gear to the lobster fishery, (3) reliance on the flawed Conservation Framework, (4) failure to account for natural mortality, (5) erroneous assumptions about the risk of entanglement when whales are not present in the lobster fishery, (6) failure to account for mitigation measures, (7) failure to account for the benefit of weak links, (8) reliance on inaccurate and outdated population modeling, (9) reliance on worst-case scenarios, and (10) use of inaccurate modeling techniques. These errors resulted in arbitrary calculations of assumed risk and attribution of that assumed risk to the Maine lobster fishery.

96.     NMFS's failure to rely on, or properly apply, the best available commercial and scientific information, along with the repeated and compounding effects of NMFS's erroneous and unsupported assumptions, caused NMFS to substantially overestimate the alleged negative effects of the American Lobster Fishery on the North Atlantic right whale and to mischaracterize the environmental baseline. This violates NMFS's obligation to evaluate the environmental baseline and the reasonably certain effects of the American Lobster Fishery, in violation of the ESA and the APA.

*Maine Lobstermen's Ass'n v. NMFS et al.*

97.     NMFS's 2021 BiOp is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

### SECOND CLAIM: The 2021 BiOp's Conservation Framework Arbitrarily, Capriciously, and Unlawfully Imposes and Requires Reductions from the Lobster Fishery

98.     Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 97.

99.     The 2021 BiOp compounds the errors in overestimating the effects of the American Lobster Fishery, including the Maine lobster fishery, on the North Atlantic right whale by imposing a Conservation Framework that requires unnecessary reductions unsupported by and contrary to scientific evidence or analysis. As set forth above, the Conservation Framework requires the American Lobster Fishery to achieve a 98% reduction in serious injury and mortality events, reducing the annual level to 0.136 events per year. This annual level of 0.136 serious injury and mortality events has no scientific basis, is a fraction of the existing "potential biological removal" level under the MMPA, and far exceeds anything needed to avoid jeopardizing the continued existence of the North Atlantic right whale or to avoid adversely modifying or destroying critical habitat under the ESA.

100.    NMFS's imposition of the Conservation Framework's risk reduction targets in the 2021 BiOp and its stated intent to impose fishing closures and restrictions to achieve those targets are not based on the best available scientific and commercial information under the ESA and are arbitrary, capricious, and an abuse of discretion under the APA.

101.    The Conservation Framework's risk reduction targets also violate the ESA because they exceed NMFS's authority under the ESA, and are *ultra vires*. NMFS has the authority to impose "reasonable and prudent measures" under the ESA that are "necessary or appropriate to minimize" the "impact" of the taking caused by the action under review. 16

*Maine Lobstermen's Ass'n v. NMFS et al.*

U.S.C. § 1536(b)(4)(C)(ii). The Conservation Framework's 98% risk reduction goal—taking the impact of the fishery well below the MMPA's conservative potential biological removal level— is intended to offset the impact of foreign fisheries and vessel strikes, not the impact of the American Lobster Fishery. Furthermore, the Conservation Framework's risk reduction targets are neither reasonable nor prudent as those goals do not appear achievable without closing or severely restricting the fishery in a manner that would be economically disastrous to the American Lobster Fishery. In addition, reasonable and prudent measures are limited to minor changes, and the draconian reductions required by the Conservation Framework far exceed that limitation. For these reasons too, the targets in the Conservation Framework violate the ESA and the APA.

102.    The Conservation Framework used by NMFS and the associated risk reduction targets NMFS is imposing upon the American Lobster Fishery in its 2021 BiOp are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

### THIRD CLAIM: NMFS Arbitrarily, Capriciously, and Unlawfully denied MLA ESA Section 7 Applicant Status

103.    Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 102.

104.    Under ESA Section 7, the term "applicant" "refers to any person, as defined in section 3(13) of the [ESA], who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. Applicants are entitled to numerous rights pursuant to ESA Section 7 and federal regulations and guidance implementing ESA Section 7.

*Maine Lobstermen's Ass'n v. NMFS et al.*

105.    MLA qualified as an applicant, pursuant to ESA Section 7, for the consultation that led to the issuance of the 2021 BiOp.

106.    NMFS's denial of MLA's request for applicant status, including its refusal to allow MLA to participate in the consultation as an applicant, violates ESA Section 7 and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

**FOURTH CLAIM: NMFS Arbitrarily, Capriciously, and Unlawfully Relied on the 2021 BiOp When It Issued the TRP Rule**

107.    Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 106.

108.    When issuing the TRP Rule, NMFS relied upon the 2021 BiOp to meet its obligations under ESA Section 7.

109.    Because the 2021 BiOp is arbitrary and unlawful for all of the reasons set forth in this Complaint, NMFS's reliance on the 2021 BiOp for its issuance of the TRP Rule violates ESA Section 7 and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

**VII.  PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

A.    Declare that the Defendants, in issuing the 2021 BiOp, including the Conservation Framework, and the TRP Rule, violated the ESA and APA by substantially overestimating the effects of the American Lobster Fishery, including the Maine lobster fishery, on the North Atlantic right whale and by imposing unnecessary and inappropriate conservation targets and restrictions on the Maine lobster fishery;

B.      Remand, without vacatur, the 2021 BiOp, including the Conservation Framework,

and the TRP Rule, to NMFS to comply with the ESA and APA;

C.      Award Plaintiff the costs of this action, including reasonable attorneys' fees

pursuant to the Equal Access to Justice Act; and

D.      Grant such other relief as this Court deems just and proper.


Respectfully submitted this 27th day of September, 2021.


STOEL RIVES, LLP

*/s/ Ryan Steen*
Ryan Steen, D.C. Bar No. 1615260
Jason Morgan, D.C. Bar No. 1615129
James Feldman (*pro hac vice* pending)
600 University Street, Suite 3600
Seattle, Washington 98101
Phone: (206) 624-0900
Fax: (206) 386-7500
Email: ryan.steen@stoel.com
          jason.morgan@stoel.com
          james.feldman@stoel.com

*Attorneys for Maine Lobstermen's Association, Inc.*


*/s/ Jane C. Luxton*
Jane C. Luxton, D.C. Bar No. 243964
LEWIS BRISBOIS BISGAARD & SMITH LLP
2112 Pennsylvania Ave., NW, Ste. 500
Washington, D.C. 20037
Phone: (202) 558-0659
Email: Jane.Luxton@lewisbrisbois.com

*Attorney for Maine Lobstermen's Association, Inc.*


*/s/ Mary Anne Mason*
Mary Anne Mason, D.C. Bar No. 375825
MAINE LOBSTERMEN'S ASSOCIATION, INC.

2 Storer Street, Suite 203
Kennebunk, ME 04043
Phone: (202) 262-2424
Email: Maryanne@mainelobstermen.org

*General Counsel for Maine Lobstermen's
Association, Inc.*

112430487.6 0074237-00001