# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAINE LOBSTERMEN'S ASSOCIATION, INC.<br>2 Storer St., Suite 203<br>Kennebunk, ME 04043 | Case No.:  1:21-cv-2509-JEB |
| Plaintiff, | |
| STATE OF MAINE, DEPARTMENT OF MARINE RESOURCES<br>32 Blossom Lane<br>Augusta, Maine 04333-0021<br>Intervenor-Plaintiff, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE<br>1315 East-West Highway<br>Silver Spring, MD 20910 | |
| GINA RAIMONDO, in her official capacity as Secretary of Commerce,<br>United States Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, D.C. 20230 | |
| JANET COIT,<br>in her official capacity as<br>Assistant Administrator for Fisheries,<br>National Marine Fisheries Service<br>1315 East-West Highway<br>Silver Spring, MD 20910 | |
| Defendants. | |

## [PROPOSED] COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.  INTRODUCTION

1.      The Maine lobster fishery is essential to Maine's culture, heritage, and economy.

For more than 175 years, the fishery has supported communities and generations of families in

1

Maine, while ensuring that this important natural resource is sustainably harvested for generations to come. This conscientious stewardship has been undeniably successful—the Maine lobster stock continues to thrive at healthy levels and the fishery remains one of the most valuable in the United States.

2.      Despite being a model for sustainability success, Maine's lobster fishery is now endangered as a result of a misguided federal decision that is not supported by the best available science and ecological knowledge gained from the experience of fishermen.

3.      Specifically, in 2021, the National Marine Fisheries Service ("NMFS") issued a biological opinion (the "2021 BiOp"), pursuant to the Endangered Species Act ("ESA"), that evaluates the impacts of multiple fishery management plans (including for the Maine lobster fishery) on the North Atlantic right whale. Through a "Conservation Framework," the 2021 BiOp mandates that U.S. fixed gear fisheries (including the Maine lobster fishery) implement additional conservation measures to achieve an *additional* 98% risk reduction in the incidence of "serious injury and mortality" interactions between this fishing gear and North Atlantic right whales over the next 10 years.

4.      NMFS's mandate ignores the reality that the Maine lobster fishery *already* has an extremely low incidence of interactions with right whales due, in part, to a suite of mitigation measures that have been implemented for many years. Reducing its already low impact *by another 98%* is not possible without driving most of Maine's harvesters out of business permanently.

5.      NMFS' mandate threatens the continuing existence and future of a fishery and a culture that has existed in  Maine for over 175 years.  The economic impacts to the state and implications of that loss for rural communities will be devastating.  To make matters worse,

2

these tragic losses will be for naught. NMFS will have accomplished no meaningful benefit to the North Atlantic right whale because, as reflected in its 2021 BiOp and discussed below, NMFS failed to forthrightly address the most significant causes of harm to North Atlantic right whales or to apply the best available science.

6.      The Maine lobster fishery has long embraced, and continues to embrace, a strong desire to conserve and coexist with the North Atlantic right whale. Indeed, Maine DMR and the fishery have implemented measures over the past two decades to reduce the risk  posed to North Atlantic right whales, including the elimination of floating groundline,  lengthening trawls to reduce vertical lines, gear modifications, and effort reductions. These actions have come at no small cost to lobstermen and were implemented with extremely high compliance by lobstermen. And they have been successful as there has not been a *single* known North Atlantic right whale entanglement with Maine lobster gear in *almost two decades*. While NMFS continues to point to the number of vertical lines associated with the Maine lobster fishery as an indicator of the risk its poses, the fact is that there has *never* been a known North Atlantic right whale serious injury or mortality interaction associated with Maine lobster gear.

7.      Critically important new scientific information about right whale habitat use patterns shows that the Maine lobster fishery will continue to pose very little risk to North Atlantic right whales. Numerous independent scientists have demonstrated that changes in the oceanic environment have pushed the migration path of right whales increasingly out of the Gulf of Maine. and squarely into heavily used Canadian waters—where whales feed and are routinely entangled in snow crab fishing gear and struck by vessels, and where conservation measures have lagged far behind those implemented in the Maine lobster fishery. This new information

establishes that North Atlantic right whales, while migrating through the far offshore areas of the

Gulf of Maine, are not aggregating in Lobster Management Area 1 off the coast of Maine.

8.       The 2021 BiOp does not account for the best available scientific information. It is

premised on a number of erroneous assumptions, including the erroneous assumption that all

fishing rope presents deadly risk to North Atlantic right whales and, therefore, all rope must be

eliminated regardless of what the best available information *actually* shows about the relative

risks to right whales. When operating upon this false premise, the Maine lobster fishery becomes

an easy regulatory target for NMFS because it is the largest U.S. fishery addressed by the 2021

BiOp and, as such, has the most rope in the water.

9.       Because the 2021 BiOp is based on the simplistic and false premise that more

lobster rope in the water equals more risk to whales—regardless of gear type, location,

configuration, presence of weak insertions, other mitigation measures, oceanographic conditions,

and whale behavior and distribution—it exaggerates and arbitrarily inflates the risk posed by the

Maine lobster fishery. Even worse, NMFS erroneously attributes impacts to the Maine lobster

fishery that are, in fact, caused by other fisheries (such as the Canadian snow crab fishery) or by

non-fishing vessels that are well-known to strike and kill North Atlantic right whales. NMFS

relies on these demonstrably incorrect assumptions and attributions to justify its plan to squeeze

the fishery down to reach an artificially derived risk reduction factor of 98%.

10.      Unfortunately, these punishing measures will provide no appreciable benefit for

the North Atlantic right whale while at the same time decimating the Maine lobster fishery.

Eliminating the Maine lobster fishery will not end right whale deaths in Canada or vessel strikes.

This regrettable result is the quintessential example of unlawful agency decision-making that

long ago caused the Supreme Court to admonish federal agencies to adhere to the ESA's "best

available science" requirement in order to "avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).

11.     Defendants' approval of the 2021 BiOp is unlawful because NMFS did not rely on the best available scientific information, made erroneous and arbitrary assumptions unsupported and contradicted by data and evidence, and relied on inconsistent data sets., . NMFS also ignored or arbitrarily discounted evidence that would have enabled the agency to correct its mistakes.

12.     On September 17, 2021, NMFS issued a final rule amending the regulations implementing the Atlantic Large Whale Take Reduction Plan (the "TRP Rule"), which included, *inter alia*, a fishing closure (termed the "LMA 1 Seasonal Restricted Area") applicable to participants in the Maine lobster fishery. 86 Fed. Reg. 51,970 (Sept. 17, 2021). This closure applies to a large area of productive fishing grounds which has not been shown to be an important area for right whales.   NMFS relied on the 2021 BiOp to comply with ESA Section 7 when it issued the TRP Rule.

13.     Maine DMR seeks an order from the Court declaring that NMFS's 2021 BiOp and the TRP Rule are arbitrary, capricious and in violation of the ESA, 16 U.S.C. §§ 1361–1389, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and remanding the 2021 BiOp and TRP Rule to NMFS without vacatur to address these flaws.

## II.  JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question arising under the laws of the United States) and under 28 U.S.C. § 1346 (actions against the United States).

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because this action is

brought against an agency of the United States and officers of the United States acting in their

official capacities and because Defendants maintain offices in the District of Columbia.

### III. PARTIES

**A.     Intervenor-Plaintiff**

16.     Intervenor-Plaintiff Maine DMR is a Cabinet-level state agency with

responsibility for management of marine resources within state waters.  In general, the State of

Maine's jurisdiction extends from shore seaward three nautical miles (nm).  However, through

its rules of construction (Me. Stat. tit. 12 §6002) Maine laws and regulations apply to all fishery

license holders throughout the coastal waters of the State, which extend to the limits of the

federal exclusive economic zone. Maine has the legal authority to manage and develop resources

throughout the water column and on and under the seafloor, including navigation, fishing, and

commerce.  Control over the right to permit harvesting of marine resources is delegated to the

Maine DMR.  Me. Stat. tit. 1 § 2 (1973).   Maine, like other states, historically has had and

continues to have primacy with respect to management of fish and wildlife within its borders

including within this zone.  Maine DMR's purposes include conserving and developing marine

and estuarine resources, conducting and sponsoring scientific research, and promoting and

developing Maine coastal fishing industries.  Me. Stat. tit. 12, § 6021 (2019); Me. Stat. tit. 12 §§

6051-52.

17.     The American lobster fishery along the Atlantic coast is largely a nearshore fishery

occurring in state waters.  For example, approximately 70% of Maine's lobster fishery occurs in

state waters.  To harvest lobster in Maine state waters, or to land lobster in Maine, harvesters must

be licensed by the state.  To harvest lobster in federal waters, harvesters must also hold a federal

permit that authorizes lobster harvest.   State licenses and federal permits authorize harvesters to

harvest in specific areas, and areas may have differing restrictions, such as the number of traps that may be fished, or the size of the lobster which may be retained.  Lobster harvesters licensed by the state are under the jurisdiction of Maine's statutes and regulations even if they are fishing in federal waters and must follow the most restrictive measures of any jurisdiction where they are licensed or permitted.  There were 5745 commercial harvesters licensed to harvest lobster in Maine in 2020, and approximately 1260 of those hold federal permits.  Of these commercial license holders, approximately 1100 are licensed student harvesters, who are completing the requirements of a program established to provide entry into the fishery for young people from fishing communities.

18.     The Maine lobster fishery is well-regarded for its conservation measures, many of which have been proposed by industry and in effect for a century or more.  The fishery is constrained by the number of traps which may be fished, and other controls on effort.  As part of its commitment to the conservation of the resource, Maine DMR devotes a substantial amount of agency staff and fiscal resources to support monitoring, research, management and enforcement of the lobster resource.  Maine DMR has been an advocate for additional measures to obtain better data on the Maine lobster fishery, which are critical to inform the consideration of right whale measures and estimate impacts on the lobster industry.

19.     Maine DMR has been actively and diligently involved in efforts to protect the North Atlantic right whale population. Maine DMR serves as the state's official representative in federal and interstate fisheries management bodies, including the Atlantic States Marine Fisheries Commission (ASMFC/Commission), the New England Fishery Management Council (NEFMC), and the Atlantic Large Whale Take Reduction Team (ALWTRT).  Maine DMR has been an active participant in the federal process to develop conservation measures for the North

Atlantic right whale. This includes consistent participation on the ALWTRT, numerous written Plan.

20.     Over the past decade, the Maine lobster comment letters, including a comment letter on the 2021 BiOp, frequent meetings with NOAA leadership and staff, extensive outreach with Maine's fishing industry throughout federal rulemaking, and collaborative research to develop and test gear modifications to reduce entanglement risk, such as weak points. In December 2019, Maine DMR submitted a proposal to inform NMFS's development of the proposed rule. Maine DMR also holds a seat on the Northeast Implementation Team for the Right Whale Recovery fishery has substantially reduced the risk it once presented to North Atlantic right whales through implementation of risk reduction measures.  As an example, since the imposition of the requirement for sinking groundlines, there have been no entanglements documented in groundlines from the Maine lobster fishery, indicating that this has been an effective measure for reducing risk.

21.     Defendants' promulgation of the 2021 BiOp and TRP Rule based on faulty science and assumptions in violation of the ESA and APA has caused and continues to cause economic, cultural and procedural injury to Maine through the imposition of arbitrary risk reduction targets and mandating superfluous current and future obligations to reduce North Atlantic right whale fishing gear interactions.  These injuries will be redressed by the relief requested, as that relief would undo the causes of those actual and threatened injuries.  Maine DMR has no other adequate remedy at law.

**B.    Defendants**

22.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce and is sued in her official capacity. Secretary Raimondo directs all business of the Department of

Commerce and is the official ultimately responsible under federal law for ensuring that the actions and decisions of the Department comply with all applicable laws and regulations.

23.     Defendant Janet Coit is Deputy Administrator of the National Oceanic and Atmospheric Administration ("NOAA") and Assistant Administrator for NMFS. Administrator Coit has responsibility for implementing and fulfilling the agency's duties under the ESA. Administrator Coit is sued in her official capacity.

24.     Defendant NMFS is an agency within the U.S. Department of Commerce and is sometimes referred to as NOAA Fisheries. NMFS is the agency to which the Secretary of Commerce has delegated authority to manage productive and sustainable fisheries and to conserve protected resources.

## IV.  LEGAL FRAMEWORK

### A.     Endangered Species Act

25.     The ESA protects imperiled species by providing the implementing agencies with authority to list qualifying species as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

26.     Additionally, Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" listed species or result in the "destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). NMFS does so by issuing a biological opinion. 50 C.F.R. § 402.14(g)(4).

27.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NMFS when their actions "may affect" a listed marine species. 16 U.S.C. §

1536(a)(2). The agencies must utilize the "best scientific and commercial data available" during the consultation process. *Id.*; 50 C.F.R. § 402.14(f), (g)(8). If NMFS determines that the agency action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action. 16 U.S.C. § 1536(b)(3). The agencies may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13.

28.     A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in "take" incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4). Among other requirements, an incidental take statement must specify any "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize the impact of any incidental take as well as "terms and conditions" to implement those measures. *Id.*; 50 C.F.R. § 402.14(i).

**B.     Marine Mammal Protection Act**

29.     The MMPA, like the ESA, generally prohibits the "taking" of marine mammals. 16 U.S.C. § 1371(a). Commercial fishing operations, however, may incidentally take marine mammals provided that they comply with the requirements of the MMPA. 16 U.S.C. § 1387.

30.     The MMPA's protective standards are qualitatively more stringent than the ESA's standards and more protective of marine mammals. One of the MMPA's most precautionary conservation metrics is the "potential biological removal level." 16 U.S.C. § 1362(20). The potential biological removal level is the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id*. "Optimum sustainable population," in turn, means "with respect to any population stock, the number of animals which will result in the

maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id*. § 1362(9).

31.     The MMPA imposes additional conservation measures for "strategic stocks." Strategic stocks include those marine mammals that are listed as threatened or endangered under the ESA, as well as those stocks where the human-caused mortality exceeds the potential biological removal level. *Id*. § 1362(19). The MMPA authorizes, and, in some cases, requires NMFS to "develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion" of strategic stocks that interact with commercial fisheries. *Id*. § 1387(f)(1). The take reduction plan is developed by the take reduction team, which is established by NMFS pursuant to the requirements of the MMPA. *Id*.

**C.      Administrative Procedure Act**

32.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

33.     Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

34.     Suits against the government for maladministration of the ESA are properly brought under the APA. *See Conservation Force v. Salazar*, 753 F. Supp. 2d 29 (D.D.C. 2010).

35.     An agency's issuance of a biological opinion constitutes "final agency action" subject to review under the APA. *See Bennett*, 520 U.S. at 178.

## V.  BACKGROUND

### A.    History of the Maine Lobster Fishery

36.    The Maine lobster fishery is one of the oldest continuously operated industries in the United States. With the advent of canning, Maine established the first commercial lobster fishery in the 1840s. In the intervening 180 years, the tradition of lobstering has been passed down for generations and is a cornerstone of Maine's culture, heritage, and economy.

37.    The Maine lobster fishery has long prided itself on being a sustainable industry. The fishery adopted rules in the late 1800s to protect the resource and prevent overfishing by restricting the fishery to trap gear, banning the catch of and protecting egg-bearing female lobsters, and restricting the size of lobsters that may be retained. Through these and other conservation measures, the lobster fishery remains vibrant today and is one of the country's most valuable commercial fisheries. In 2020 alone, over $405 million worth of lobster was caught off the coast of Maine. For rural coastal communities in Maine, the lobster fishery is the economic engine that keeps those towns alive.

38.    The Maine lobster fishery supports tens of thousands of jobs and hundreds of ancillary businesses. Maine's lobster fleet directly supports more than 10,000 jobs. Maine's wholesale lobster distribution supply chain is estimated to contribute an additional $967 million and 5,500 jobs.

### B.    The North Atlantic Right Whale

39.    In the early 1890s, commercial whalers hunted North Atlantic right whales to the brink of extinction. As a result, the North Atlantic right whale has been listed as endangered under the ESA or its predecessor act since 1970.  Maine DMR has routinely worked with federal, state and industry partners to improve the science and data available to support conservation

measures for North Atlantic right whales. Maine DMR is committed to solving issues regarding the endangered status of right whales.

40.     Maine DMR has incorporated measures implemented via the Atlantic Large Whale Take Reduction Plan in state regulations to ensure sufficient enforcement and high industry compliance.  These measures have included 600-pound weak links at the buoy, gear markings to identify gear, sinking groundline to reduce entanglements, and trawling-up requirements (a minimum number of traps fished on a trawl) to reduce the number of vertical lines in the fishery.

41.     Maine DMR has a history of expanding state regulatory measures beyond the minimum federal requirements into areas exempted from the federal Atlantic Large Whale Take Reduction Plan.  Maine DMR prohibits float rope on the surface for all lobster pot gear, including gear fished inside the federal exemption line—an area into which NMFS found, based on scientific data, endangered large whales rarely venture (72 Fed. Reg. 57104, 57162 (Response to comment 337)).  Ahead of federal gear marking requirements, Maine DMR adopted rules to implement a Maine-specific purple gear mark, increase the frequency of markings on a rope, and expand gear markings into exempted waters.  Maine Marine Patrol and the Bureau of Marine Science also collaborate with NMFS, serving as primary regional responders to address whale entanglements off the Maine coast.

42.     Maine DMR has contributed a significant body of work to inform understanding of how the lobster fishery interacts with the North Atlantic right whale.  Maine DMR has collected data that are used to improve decision support tools that assess the value of risk reduction measures being considered by NMFS to protect right whales, such as gear

configuration and breaking strength of rope and "weak points."   Maine DMR is conducting

work to monitor for right whales, and to explore vessel tracking in the lobster fishery.

43.     There has never been a known North Atlantic right whale serious injury or

mortality associated with Maine lobster gear.

**C.     Previous Litigation Challenging the 2014 Biological Opinion**

44.     On January 18, 2018, a coalition of environmental advocacy groups filed a

lawsuit challenging the biological opinion issued by NMFS in 2014 (the "2014 BiOp") regarding

effects of the American Lobster Fishery on the North Atlantic right whale. Those groups alleged

that the 2014 BiOp violated the ESA, the MMPA, and the APA.

45.      Maine DMR participated as amicus curiae in the litigation.

46.     On April 9, 2020, the District Court for the District of Columbia issued a decision

invalidating NMFS's 2014 BiOp. *Ctr. for Biological Diversity v. Ross*, No. CV 18-112 (JEB),

2020 WL 1809465 (D.D.C. Apr. 9, 2020). Although the Court vacated a portion of the 2014

BiOp pertaining to the North Atlantic right whale, the Court stayed its order for nine months

until May 31, 2021, thereby allowing the lobster fishery to continue operating and providing

NMFS additional time to complete work on a new biological opinion and a new MMPA rule.

*Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. Aug. 19, 2020).

**D.     The 2021 Biological Opinion**

47.     NMFS initiated the Section 7 consultation leading to the draft biological opinion

("Draft BiOp") against the backdrop of an unusual mortality event declared in mid-2017—which

included the unprecedented loss of 12 right whales in Canada—interrupting a prolonged period

of improvement in the prospects for recovery of the North Atlantic right whale. The right whale

population had nearly doubled under the guidance of the Take Reduction Team and the

associated TRP implemented by NMFS pursuant to Section 118(f) of the MMPA, reflecting two

decades of collaboration among lobstermen, researchers, managers, and other stakeholders to develop and implement innovative fishing practices and gear strategies to reduce interactions between whales and fishing gear.

48.     NMFS released the Draft BiOp on January 15, 2021.  Maine DMR, along with other stakeholders representing active participants in the American Lobster Fishery as well as the individuals and organizations that rely upon the fishery, submitted detailed comments, identifying significant concerns associated with the data and analyses presented in the Draft BiOp.  Maine DMR's comments also made recommendations for additional data and analyses to be considered and undertaken by NMFS to ensure that the decision complies with the ESA. *See* Exhibit A.

49.     On May 27, 2021, NMFS released the final 2021 BiOp. The deficiencies and concerns identified by Maine DMR were not addressed by NMFS in the final 2021 BiOp. These deficiencies include, but are not limited to, the following.

**1.     NMFS arbitrarily assigned right whale impacts from Canadian fisheries to the Maine lobster fishery.**

50.     In the 2021 BiOp, for the purpose of apportioning "risk" levels, NMFS determined that all fishing gear entanglements with North Atlantic right whales of "unknown" origin should be equally allocated (50:50) between the U.S. and Canada. This determination is one of the most significant unsupported assumptions in the 2021 BiOp because the vast majority of all right whale serious injury and mortality entanglements attributed to the American Lobster Fishery are either cases with no fishing gear at all or involve fishing gear of unknown origin. Moreover, in recent years, most right whale serious injury and mortality entanglements involving fishing gear of known origin involve Canadian fishing gear. NMFS's apportionment of risk levels is arbitrary and contrary to the best available scientific and commercial information for

these and the following reasons as well as other reasons repeatedly brought to NMFS's attention by Maine DMR, including in Maine DMR's comments on the draft 2021 BiOp.

51.     The best available data show an increasing trend in known right whale entanglements, particularly in the proportion of entanglements causing serious injury and mortality, with Canadian fishing gear. At the same time, known entanglements in U.S. fisheries, particularly the Maine lobster fishery, have decreased, with none being observed in the Maine lobster fishery in over 17 years. The 2021 BiOp erroneously discounts the value of known entanglement trends despite NMFS's own data showing that many of all known whale entanglements have been confirmed to a specific country of origin from 2016 to 2019. The 2021 BiOp's treatment of the data for known fishery interactions is arbitrary and unsupported.

52.     NMFS incorrectly relied on assumptions that right whales spend more time in U.S. waters than in Canadian waters and that right whales would be equally at risk of entanglement in either country. There are no data to support these assumptions. In so doing, NMFS arbitrarily discounted or ignored the fact that the best available science demonstrates that North Atlantic right whales have shifted habitat use away from Maine lobster fishing grounds in the Gulf of Maine and into Canadian fishing grounds. NMFS also arbitrarily failed to consider the risk to right whales during occupancy of *fishing grounds* and, instead, considered assumed risk to the animals in all waters (regardless of whether fishing occurs in those waters). Canada had few, if any, risk reduction measures in place prior to 2017, whereas U.S. fisheries implemented measures dating back to 1999, including conservation enhancements in 2009 and 2014 that significantly reduced the amount of rope in the Gulf of Maine. And although the 2021 BiOp acknowledges that the rapidly expanding Canadian snow crab fishery uses heavier and more lethal gear, it fails to calculate the risk of Canadian gear at all, thus also failing to attribute

a higher risk to this gear. The 2021 BiOp fails to properly account for these relevant factors. Thus, NMFS overestimated the risk posed by the Maine lobster fishery while underestimating the risk from Canadian fisheries.

53.     The 2021 BiOp also fails to address the difference in observation effort between Canadian and U.S. waters. Survey effort in U.S. waters has historically been significantly greater than in Canadian waters. As a result, entanglement events in Canadian waters were likely under-sampled prior to 2017, the year when survey effort in Canada was increased with the assistance of NMFS.

54.     Formal peer reviewers of modeling conducted in support of the 2021 BiOp and federal scientists have acknowledged the lack of scientific basis for NMFS's arbitrary 50:50 allocation of unknown-origin entanglements between Canada and the U.S., emphasizing that the established shift in right whale migratory routes into previously unregulated areas has resulted in an increase in entanglements, including serious injury and mortality, in Canadian trap/pot gear. The BiOp fails to adequately account for data and analyses showing that the largest current entanglement threat to North Atlantic right whales is posed by Canadian snow crab fishing gear. Indeed, the Atlantic Scientific Review Group recently recommended that NMFS reassess its 50:50 apportionment of right whale mortality between the U.S. and Canada.

55.     The 2021 BiOp erroneously and arbitrarily places undue emphasis on the quantity of vertical lines in the water when assigning risk to fisheries, and arbitrarily discounts (a) trends within and among gear types associated with right whale entanglements, (b) right whale geographic and temporal occurrence, (c) right whale behavior, and (d) the location and timing of different fisheries.

56.     The result of NMFS's arbitrary and unsupported determination to apportion right whale entanglements with fishing gear of unknown origin equally between the U.S. and Canada is that the 2021 BiOp assigns risk (and therefore impact) to the Maine lobster fishery that, in fact, derives from Canadian fisheries. The 2021 BiOp is therefore premised on an assumption that the Maine lobster fishery causes more impact to the North Atlantic right whale than is otherwise demonstrated by the best available scientific and commercial information.

**2.      The 2021 BiOp's Conservation Framework is fundamentally flawed.**

57.     The 2021 BiOp relies on a Conservation Framework that is fundamentally flawed. The Conservation Framework includes four phases over 10 years and expects and requires the Maine lobster fishery to ultimately achieve a 98% reduction in North Atlantic right whale mortality and serious injury at the end of phase four. The Conservation Framework (a) inflates the amount of take attributable to the Maine lobster fishery with overly conservative or erroneous assumptions, (b) fails to fully account for and incorporate the benefits from risk reduction measures from early phases of the Conservation Framework, and (c) requires the Maine lobster fishery to implement a series of further, drastic, and likely ruinous measures.

58.     Particularly unlawful is the Conservation Framework's 10-year benchmark of 0.136 average annual mortalities or serious injuries. This figure is arbitrary and unsupported by science or the law. NMFS provides no explanation supporting this metric or showing how it was calculated. NMFS's requirement that the mortality and serious injury rate "needs to be reduced" to 0.136 to achieve a "no jeopardy" determination has no precedent in the law, science, or practice, and arbitrarily demands a result that exceeds the requirements of both the ESA and the MMPA.

59.     Even if it were possible to reduce the jeopardy inquiry to a single metric, there is no rational basis for NMFS to conclude that a mortality and serious injury rate of approximately

*one-eighth* of the established "potential biological removal" rate established under the MMPA is *necessary* for a no-jeopardy finding.

60.     Regulating the Maine lobster fishery down to an annual mortality and serious injury rate of 0.136 from the over-inflated impact rates attributed to the fishery under the 2021 BiOp would mean the economic decimation, if not elimination, of the fishery. Moreover, NMFS's imposition of this metric is inconsistent with and undermines the MMPA's long-term take reduction planning goal, which expressly requires that take reduction plans consider impacts on fishery economics. The establishment of an imposed metric that exceeds requirements to meet MMPA goals and likely renders a fishery economically non-viable far exceeds NMFS's obligations and authority, and is arbitrary, *ultra vires*, and otherwise contrary to law. The 2021 BiOp, including its Conservation Framework, is therefore unlawful.

   **3.     NMFS failed to account for known causes of North Atlantic right whale mortality and arbitrarily assigned all cryptic mortality to anthropogenic causes.**

61.     Without explanation, NMFS arbitrarily assumed there is no natural mortality among North Atlantic right whales. This assumption ignores published scientific literature that documents two natural sources of right whale mortality—predation by a growing white shark population on right whale calves and recent unfavorable oceanographic conditions resulting from climate change.

62.     NMFS's disregard of natural sources of mortality has the effect of underestimating the reproductive capacity of the North Atlantic right whale species and ability of the population to rebound in response to a reduction in anthropogenic mortality and more favorable oceanographic conditions as this population has demonstrated in the past.

63.     The effect of NMFS's arbitrary decision to ignore natural sources of mortality is magnified by NMFS's related arbitrary decision to attribute *all* cryptic mortality to

anthropogenic sources. This, in turn, caused NMFS to erroneously overestimate the impact of the

Maine lobster fishery on the North Atlantic right whale.

**4.     NMFS erroneously assigned a risk of entanglement to the Maine lobster fishery based on whale occurrence in areas where no lobster gear is present.**

64.     NMFS arbitrarily assumed that North Atlantic right whales are at risk of

entanglement from lobster gear at any time when they are in U.S. waters, even when they are

documented in large numbers in U.S. waters distant from the Maine lobster fishery and even in

Maine waters where survey effort revealed rare presence of whales. This also caused NMFS to

erroneously overestimate the impact of the Maine lobster fishery on the North Atlantic right

whale.

**5.     NMFS failed to properly account for mitigation measures implemented by the Maine lobster fishery.**

65.     NMFS failed to properly account for all of the mitigation measures that the

American Lobster Fishery, including the Maine lobster fishery, has implemented over more than

two decades.

66.     Since 2009, an enhanced regulatory environment has implemented numerous

measures aimed at reducing the risk of right whale entanglement in U.S. lobster fishing gear.

Regulations developed and imposed at the state and federal level, including those implemented

under the TRP, have significantly modified the conduct of the lobster fishery with the aim of

reducing the risk of a severe outcome if a right whale encounters such modified gear.

67.      For example, a suite of universal gear requirements and modifications has been in

place for more than 20 years to reduce entanglement risk to right whales. These requirements

prohibit the use of floating line at the surface, require gear to be hauled at least every 30 days,

and require the incorporation of weak links in the top of the buoy line and any attachments along

the buoy line. Federally regulated fixed-gear fishermen are required to mark vertical lines to aid

in identifying the source of gear involved in an entanglement. In 2020, Maine implemented new regulations to require unique and expanded gear markings.

68.     Although the 2021 BiOp acknowledges that "risk reduction measures implemented in U.S. fisheries over the past two decades have reduced impacts to [North Atlantic right whales] from U.S. fisheries," NMFS arbitrarily failed to fully account for the benefits of such measures in the environmental baseline.

**6.      The 2021 BiOp does not properly account for the benefits of weak links in fishing lines.**

69.     NMFS failed to account for the full benefits associated with the use of "weak links" or "weak points" in fishing lines to be required under the TRP Rule. In addition to allowing a whale to break free of the gear, this mitigation measure will reduce the severity of any entanglements that occur, decreasing the risk of right whale serious injury and mortality, reducing stress on the animal, and enhancing the future health of the population. Published scientific literature, ignored by NMFS's analysis, finds that the use of weak links and points in fishing ropes can substantially reduce impacts to North Atlantic right whales.

70.     The American Lobster Fishery, including the Maine lobster fishery, implements weak links below the buoy and will include weak points in vertical rope under the TRP Rule. The 2021 BiOp arbitrarily discounts and fails to properly account for the benefits of doing so.

**7.      NMFS arbitrarily selected inconsistent data.**

71.     NMFS arbitrarily selected data from the 2010–2019 time period and assumed that unfavorable trends in oceanographic conditions would continue but did not take a similar approach with trends in observed data on the sources of entanglements. These latter trends demonstrate a precipitous decline in known U.S. entanglements, that disproportionately more

entanglements are due to Canadian fisheries and, in the U.S., that more entanglements result from non-lobster gear. NMFS's selective and inconsistent use of this data is arbitrary.

**8.    The 2021 BiOp relies on inaccurate modeling techniques.**

72.    The 2021 BiOp relies on modeling techniques that do not accurately capture the risk within and among gear types and rigging methods or changes in risk due to changes in North Atlantic right whale behavior. This flawed modeling also caused NMFS to arbitrarily allocate assumed risk and impacts to the Maine lobster fishery contrary to the best available information.

## VI.   CLAIMS FOR RELIEF

**FIRST CLAIM: The 2021 BiOp Arbitrarily, Capriciously, and Unlawfully Overestimates Impact and Risk from the American Lobster Fishery**

73.    Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 72.

74.    Section 7 of the ESA requires NMFS to issue a biological opinion that evaluates the effects of an action based on an objective assessment of the "reasonably certain" effects of that action on threatened or endangered species and related critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.17 (effects of action must be "reasonably certain to occur"). A biological opinion must also properly account for the environmental baseline, which "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02 (definition for "environmental baseline").

75.    In evaluating the effects of the action, NMFS must use the "best scientific and commercial data" when developing a biological opinion. 16 U.S.C. § 1536(a)(2). The "obvious

purpose" of this requirement "is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise," particularly when doing so would cause "needless economic dislocation." *Bennett*, 520 U.S. at 176.

76.     As set forth above and in Maine DMR's comments on the Draft BiOp, NMFS, when assessing and determining the effects of the American Lobster Fishery on the North Atlantic right whale, failed to use the best available scientific or commercial information. NMFS further inflated the alleged negative effects of the American Lobster Fishery, including the Maine lobster fishery, by repeatedly including overly conservative assumptions regarding the fishery's potential effects, contrary to the recommendations of independent experts. These errors include, but are not limited to, the 2021 BiOp's (1) allocation of U.S./Canadian entanglements on a 50/50 basis, (2) reliance on the flawed Conservation Framework, (3) failure to account for natural mortality, (4) erroneous assumptions about the risk of entanglement when whales are not present in the lobster fishery, (5) failure to account for mitigation measures, (6) failure to account for the benefit of weak links, (7)  reliance on inconsistent data sets, and (8) use of inaccurate modeling techniques. These errors resulted in arbitrary calculations of assumed risk and attribution of that assumed risk to the Maine lobster fishery.

77.     NMFS's failure to rely on, or properly apply, the best available commercial and scientific information, along with the repeated and compounding effects of NMFS's erroneous and unsupported assumptions, caused NMFS to substantially overestimate the alleged negative effects of the American Lobster Fishery on the North Atlantic right whale and to mischaracterize the environmental baseline. This violates NMFS's obligation to evaluate the environmental baseline and the reasonably certain effects of the American Lobster Fishery, in violation of the ESA and the APA.

78.     NMFS's 2021 BiOp is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

**SECOND CLAIM: The 2021 BiOp's Conservation Framework Arbitrarily, Capriciously, and Unlawfully Imposes and Requires Reductions from the Lobster Fishery**

79.     Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 78.

80.     The 2021 BiOp compounds the errors in overestimating the effects of the American Lobster Fishery, including the Maine lobster fishery, on the North Atlantic right whale by imposing a Conservation Framework that requires unnecessary reductions unsupported by and contrary to scientific evidence or analysis. As set forth above, the Conservation Framework requires the American Lobster Fishery to achieve a 98% reduction in serious injury and mortality events, reducing the annual level to 0.136 events per year. This annual level of 0.136 serious injury and mortality events has no scientific basis, is a fraction of the existing "potential biological removal" level under the MMPA, and far exceeds anything needed to avoid jeopardizing the continued existence of the North Atlantic right whale or to avoid adversely modifying or destroying critical habitat under the ESA.

81.     NMFS's imposition of the Conservation Framework's risk reduction targets in the 2021 BiOp and its stated intent to impose fishing closures and restrictions to achieve those targets are not based on the best available scientific and commercial information under the ESA and are arbitrary, capricious, and an abuse of discretion under the APA.

82.     The Conservation Framework's risk reduction targets also violate the ESA because they exceed NMFS's authority under the ESA, and are *ultra vires*. NMFS has the authority to impose "reasonable and prudent measures" under the ESA that are "necessary or appropriate to minimize" the "impact" of the taking caused by the action under review. 16

24

U.S.C. § 1536(b)(4)(C)(ii). The Conservation Framework's 98% risk reduction goal—taking the impact of the fishery well below the MMPA's conservative potential biological removal level— is intended to offset the impact of foreign fisheries and vessel strikes, not the impact of the American Lobster Fishery. Furthermore, the Conservation Framework's risk reduction targets are neither reasonable nor prudent as those goals do not appear achievable without closing or severely restricting the fishery in a manner that would be economically disastrous to the American Lobster Fishery. In addition, reasonable and prudent measures are limited to minor changes, and the draconian reductions required by the Conservation Framework far exceed that limitation. For these reasons too, the targets in the Conservation Framework violate the ESA and the APA.

83.     The Conservation Framework used by NMFS and the associated risk reduction targets NMFS is imposing upon the American Lobster Fishery in its 2021 BiOp are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

### THIRD CLAIM: NMFS Arbitrarily, Capriciously, and Unlawfully Relied on the 2021 BiOp When It Issued the TRP Rule

84.     Plaintiff incorporates by reference each of the allegations set forth above in paragraphs 1 through 83.

85.     When issuing the TRP Rule, NMFS relied upon the 2021 BiOp to meet its obligations under ESA Section 7.

86.     Because the 2021 BiOp is arbitrary and unlawful for all of the reasons set forth in this Complaint, NMFS's reliance on the 2021 BiOp for its issuance of the TRP Rule violates ESA Section 7 and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

## VII.  PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

A.      Declare that the Defendants, in issuing the 2021 BiOp, including the Conservation

Framework, and the TRP Rule, violated the ESA and APA by substantially overestimating the

effects of the American Lobster Fishery, including the Maine lobster fishery, on the North

Atlantic right whale and by imposing unnecessary and inappropriate conservation targets and

restrictions on the Maine lobster fishery;

B.      Remand, without vacatur, the 2021 BiOp, including the Conservation Framework,

and the TRP Rule, to NMFS to comply with the ESA and APA;

C.      Award Plaintiff the costs of this action; and

D.      Grant such other relief as this Court deems just and proper.

DATED this 16th day of  December, 2021.


*/s/ Linda R. Larson*
Linda R. Larson, D.D.C. Bar No. MI00059
Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98101
Telephone:     206.489.5632
Facsimile:      206.489.5501
llarson@nossaman.com


Paul S. Weiland, D.D.C. Bar No. CA00005
Nossaman LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
Facsimile:  949.833.7878
pweiland@nossaman.com


*Attorneys for State of Maine,*
*Department of Marine Resources*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the United States District Court for the District of Columbia on December 16, 2021, via the Court's CM/ECF system, and that parties and their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

Dated:  December 16, 2021

*/s/ Linda R. Larson*
Linda R. Larson
